PITTSBURG, CINCINNATI, CHICAGO & ST. LOUIS RY. CO.

*v.*

JOSEPH ROBSON.

*Opinion filed October 26, 1903.*

1. RAILROADS—*what tends to show negligence on the part of railroad company.* Evidence that the crew of a switch engine refused to obey a crossing flagman's signals to stop while a number of horses were being led across the track but started up when part of them had crossed, allowing steam to escape, causing the remaining horses to run away and injure plaintiff, tends to show negligence.

2. SAME—*ordinance prohibiting escape of steam is not unreasonable.* An ordinance prohibiting the opening of cylinder cocks or safety valves on locomotives to allow the escape of steam except in starting, when the cylinder cocks may be opened for six revolutions of the driving wheels, is not void for unreasonableness.

3. PLEADING—*pleading to merits is a waiver of objections to declaration.* Pleading to the merits is a waiver of objections to the declaration, unless the latter is so defective that it will not sustain the judgment.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. ROBERT B. SHIRLEY, Judge, presiding.

This is an action on the case, begun in the superior court of Cook county on April 27, 1900, by the appellee against the appellant company to recover damages for a personal injury. The Union Stock Yards and Transit Company and the Chicago Junction Railway Company

appear to have been co-defendants below with the appellant, but the suit was dismissed against them, and allowed to stand as against the appellant. The trial resulted in verdict and judgment in favor of the appellee, which judgment, upon appeal to the Appellate Court, has been affirmed. The present appeal is prosecuted from such judgment of affirmance.

The declaration consisted of three counts, one original count and two additional counts. The original count alleges that, on March 2, 1900, upon certain railroad tracks crossing Laurel street, a much used thoroughfare at the stock yards in Chicago, appellant was operating a switch engine with certain cars attached; that appellee, who was employed in unloading and yarding stock at the stock yards, with certain other men was leading horses in a bunch, fastened together in fours—one man having charge each of four horses—northward on Laurel street toward and across the said railroad tracks; that, when a part of the horses had crossed the tracks to the north, and as plaintiff with other men was leading the other horses toward and near the tracks, the appellant through its servants approached the crossing with a switch engine; that the flagman stationed there signaled the engine to stop, so as to permit appellee and the other men to get the horses over the crossing; that, by reason of the large number of horses—there being about thirty-six—and of the manner in which they were being led across the tracks, it was appellant's duty to stop the engine until the horses had passed, but that it recklessly, carelessly and improperly ran the engine through the middle of said bunch of horses, leaving some on the north and some on the south side of the track; that, as the engine reached the crossing, its steam commenced to blow off causing great noise, which so frightened the horses that they ran away, and appellee, while attempting to hold them and while in the exercise of ordinary care for his own safety, was thrown to the ground and kicked ·

and trampled upon by the horses, and thereby permanently injured, etc.

The first additional count of the declaration alleges that, on March 2, 1900, the Union Stock Yards and Transit Company operated a railroad at the stock yards within the limits of the city of Chicago, and appellant, with the consent of said company, operated a certain engine and cars upon the railroad, which crossed a thoroughfare known as Laurel street; that section 1736 of article 2 of an ordinance, entitled "Steam Railways," of the Revised Code of Chicago, which was then and there in full force, provided that "no railroad company or person in charge of any locomotive engine shall cause or allow the cylinder cock or cocks, safety valve or other valves of any locomotive engine, to be opened so as to permit steam to escape therefrom at any time while running upon or along any railroad track, or where the engine is within one hundred feet of any street or railroad crossing or viaduct; provided, however, that, when such engine shall be standing at such point in said city, and for six revolutions of the driving wheel after being put in motion, the said cocks may be opened for the purpose of allowing condensed steam to escape;" that appellee was employed by the Chicago Junction Railway Company in unloading and yarding stock at said yards, and earned $55.00 per month, and while he, with other men, was leading a large number of horses, attached together in fours, along Laurel street towards and with the intention of crossing the railroad tracks, and while some of the men leading the horses were in the act of crossing the tracks, and as appellee, leading four horses, was approaching, and close to, the tracks, exercising ordinary care for his own safety, the appellant ran its locomotive engine along said track up to and across Laurel street, and, while doing so, wrongfully and unlawfully caused and allowed the safety valve of the engine to become open and the steam to escape therefrom in large volume

and with great noise, and, as a direct result thereof, the horses led by appellee broke away, throwing appellee down, and he was thereby kicked, dragged and trampled upon, and his back and spine seriously injured, etc.

The second additional count avers appellee's employment as above stated, and that, while he at the time in question, in the discharge of his duty, together with other men, was leading a large number of horses attached together in fours, along Laurel street, for the purpose of crossing said railroad tracks, and as certain of the men were in the act of crossing the tracks, and as he, leading four horses, was approaching close to the tracks, in the exercise of ordinary care for his safety, the appellant, through its servants, so recklessly, negligently and carelessly ran said locomotive engine upon and over the crossing through said bunch of horses, leaving some upon one side of the track and some upon the other, and permitted the steam of the engine then and there to escape in such large volume, and with such great noise, that, as a direct result thereof, the four horses, which appellee was leading, were frightened and ran away and the plaintiff was thereafter injured and damaged, etc.

GEORGE WILLARD, for appellant.

JAMES C. McSHANE, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

Upon the conclusion of all the evidence upon the trial below, the appellant asked a written instruction, instructing the jury "as a matter of law, that the pleadings and all the evidence considered, the plaintiff is not entitled to recover in this action; you will, therefore, return a verdict finding the defendant not guilty." The court refused to give this instruction, and such refusal is complained of by the appellant as error. It was not error to refuse the instruction, if there was evidence tending to

204—17

sustain the cause of action. In order to determine whether there was evidence sustaining the cause of action, it is necessary to refer briefly to the material facts. In order to entitle the appellee to recover, it was necessary to show that he was in the exercise of ordinary care for his own safety, and that the appellant was guilty of such negligence as caused the injury.

*First*—Was the appellant guilty of such negligence as caused the injury? Laurel street was a narrow street, not more than twenty-five or thirty feet wide, running north and south within the limits of what are called the stock yards. North and beyond the limits of the stock yards and south and beyond the limits of the stock yards, the street is known as Morgan street, as we understand the evidence. Persons were not allowed to travel upon so much of Laurel street, as was within the limits of the stock yards, without a permit from the authorities of the stock yards company. But stock, consisting of horses and cattle and teams, as well as people, was constantly passing up and down Laurel street across the tracks every day. Just before appellee was injured, an engine, pushing some twelve or fifteen empty refrigerator cars, approached Laurel street on the middle of the four or five tracks, which cross it at that point, coming from the west and going towards the east. About the same time nine men, including appellee, were coming from the south on Laurel street and approaching the tracks towards the north, leading about thirty-six horses in bunches each of four horses. Appellee was leading four of the horses, and was leading the third bunch from the end of the nine bunches. In other words, there were six bunches of four horses each, north of appellee, and two bunches of four horses each south of him. The horses were heavy draft horses, and were tied from halter to halter with their heads close together. As we understand the evidence, appellee was leading four of these horses by the halter which tied their heads together. The evidence shows

that this was the customary way of leading the horses. At this time, the men leading the horses were taking them from the stables of the company to certain chutes along the railway tracks for the purpose of shipping the horses. Laurel street was a planked street. There was a flagman, stationed at the point where the railroad tracks crossed Laurel street, in the employ of the stock yards company and in charge of the crossing, and whose duty it was to regulate the trains on the tracks and the traffic on the street. As the train, pushed by the engine at the west end of it, approached Laurel street, the flagman signaled it to stop, and it did so; but before the horses had all passed over the crossing, the train crew, or engineer, or whoever was in charge of the engine and the cars, started across Laurel street and refused to stop, although cautioned to do so by the flagman. All the horses, except twelve, or three bunches thereof, succeeded in crossing the tracks, some of them at the rear narrowly escaping injury from the train. Twelve of the horses, four of which at the head were led by appellee, did not succeed in getting across, and, while the engine was upon the crossing, or very near thereto, the engine blew off steam from the safety valve, making a very loud noise, which frightened all three bunches of horses, so that they ran away. The horses led by appellee, in breaking loose, knocked him down and ran over and trampled upon him.

There was evidence, tending to show that the appellant company was guilty of negligence, because its train crew ran over the crossing at the time and place in question before all the horses had passed over, and in disregard of the flagman's signal and command. The flagman says that he was at the crossing at the time; that his business there was to flag the crossing and see that stock went across carefully, and that no accident happened; that teams, or horses, or cattle, or people, passed over there every second probably; that the Panhandle men

backed their train east; that the engine was a switch engine; that the cars were east of the engine, about twelve, thirteen or sixteen of them; that they stopped probably one hundred and fifty feet west of the crossing when he flagged them to stop. The flagman says that there were one or two men on top of the cars, and he also says, "He started up again and I tried to stop him. He says 'I wont stop.' I said, 'You better stop.' * * * They shoved all the cars and engine over the crossing, and when the engine got on the crossing it blowed off steam pretty strong; * * * they made a pretty loud noise," and he says the steam came from the safety valve.

Another witness says that there were two trainmen on top of the cars, and that his attention was directed to the remark of the flagman, who shook his flag, and said: "The next time I tell you to stop, you'll stop." Still another witness, who was leading some of the horses, says, "I just got across the tracks. I seen the train backing down, and the flagman was trying to stop the train, so that we could get across. I just got across and the others were cut off; when he was trying to stop them I was just about on the crossing." The same witness also says, speaking of the flagman: "He motioned for him to stop, and he wouldn't stop; when they came along, they were exhausting steam, and it would scare any horse in the city of Chicago, if they were forty rods away from them; it made that loud a noise."

There was also evidence, tending to show negligence on the part of the appellant company, or its servants, in permitting the steam to escape from the safety valve in violation of the city ordinance, set forth in the declaration, and introduced in evidence, and set out in the statement preceding this opinion.

In the second place, in order to entitle the appellee to recover, it was necessary to show that he was in the exercise of due care for his own safety. Upon this point the evidence is substantially undisputed. When appel-

lee had approached from the south within some twenty or thirty feet of the southernmost track, he was signaled to by the flagman to stop, and he did stop. We discover nothing in the evidence to indicate that he was guilty of any want of due care for his own safety. As is well said by the Appellate Court in their opinion: "There is no contention but that the plaintiff is shown by the evidence to have been in the exercise of ordinary care for his own safety prior to and at the time of the injury, nor * * * is there any argument or statement as to any deficiency in the proof bearing on the negligence alleged in the declaration. * * * The pushing of the train over the street crossing, in direct violation of the flagman's signal, while the steam was escaping, with a loud noise, as the evidence clearly tends to show, was the proximate cause of plaintiff's injury." In view of what has been said in regard to what the evidence tends to prove, we are of the opinion that the trial court committed no error in refusing to instruct the jury to find for the appellant.

*Second*—Appellant's objection to the admission of evidence, and its criticism upon the first refused instruction, asked by the appellant, involve the same point, which relates to the ordinance in question. It is claimed that the court erred in admitting the ordinance, and in refusing the first instruction, which told the jury that the ordinance was applicable to public highways, but not to private roadways or passageways, such as Laurel street, so-called, where the accident took place.

It is said that the ordinance in question was unreasonable, and therefore void. The ordinance, as we understand the position of counsel, is said to be unreasonable upon the alleged ground that it was necessary to open the valves, and allow the steam to escape in order to prevent an explosion, and that the ordinance cannot be otherwise construed than as prohibiting absolutely the escape of steam from the safety valves at the times and places specified in the ordinance. We do not think that

the ordinance is capable of any such construction. The safety valve was provided in case of emergency, and the steam can be prevented from escaping by opening the fire-box, thereby reducing the heat in the fire-box, if the steam is found to be getting too high. The ordinance authorizes the opening of the cylinder cocks when the engine is started, and while making a given number of revolutions. The fireman can regulate the pressure of steam by the character of fire he keeps in the fire-box, but if, for any reason, the pressure runs up, he can reduce it or regulate it by opening the fire-box door. The evidence tends to show that there was no necessity, upon the occasion in question, for the engine to carry such high pressure, as the train crew were not moving more than half a train-load of cars, and were moving slowly on a level track. The evidence of the engineer tends to show that they did not usually allow the steam to "pop off," and there would seem to have been no good reason why it was permitted to "pop off" upon the occasion in question. It is highly dangerous in cities to permit engines to blow off steam in this manner, and the common council had an undoubted right, in the exercise of its police powers, to pass an ordinance forbidding it. When the pressure of the steam can be so easily regulated and its escape avoided, the ordinance forbidding its escape cannot be said to be unreasonable. It is only "an extreme case of oppression or outrage that would justify" the court in holding an ordinance unreasonable. (*Chicago and Northwestern Railway Co.* v. *Town of Cicero*, 154 Ill. 656). It must be made clearly to appear, that it is unreasonable, before the court can so declare. (*Myers* v. *City of Chicago*, 196 Ill. 591). In *Illinois Central Railroad Co.* v. *Gilbert*, 157 Ill. 354, it was held that an ordinance, requiring the ringing of a bell on an engine running within the limits of a city, would not be an unreasonable requirement.

The ordinance does not use the words, "public street," but the word, "street." While Laurel street may not have

been a public street in the sense, in which a street in a city, used by all the inhabitants thereof, is called a public street, it was yet used by all the employes of the stock yards company, and those who frequented the stock yards upon business.    Although it may have been in a certain sense a private street, the traffic on it was so great, that it was necessary to maintain a flagman at the crossing in question.    Whether or not it was a public street in such a sense, as to make the ordinance applicable to it, was a question of fact largely for the jury.    (*Pittsburg, Ft. Wayne and Chicago Railway Co.* v. *Callaghan,* 157 Ill. 406; *Chicago and Alton Railroad Co.* v. *O'Neil,* 172 id. 527).    The ordinance was designed for the protection of life and property, and was as necessary at the street in question, whether public or private, as it was at any other street or crossing having the same amount of traffic.

In addition to what has been said in regard to the ordinance, it is to be noted that the prohibition of the ordinance is against permitting "steam to escape therefrom at any time while running upon or along any railroad track" within the city of Chicago.  In the present case, the cars, which were being pushed eastward by the engine in question, and the engine itself, were certainly upon a railroad track.    By the terms of the ordinance steam may be allowed to escape while the engine is "standing, and for six revolutions of the driving wheel after being put in motion."    For the reasons above stated, we are of the opinion that the ordinance is not an unreasonable one.

It is also urged that the court below erred in refusing to give the second instruction asked by appellant.    We do not think that there was any error in this regard for the reason that the instruction ignores any violation of the ordinance in question, and expressly states that the issuance of steam from the valve under the circumstances, disclosed by the evidence, was not wrongful, whereas the question should have been left to the jury.    The instruc-

tion also states that appellant had the right to run its engine and train at the time and place in question, and thereby to create such noise, smoke and steam as was usual and customary. The evidence tended to show that it did not have the right to run its engine and train across this crossing at the time in question, in view of the large number of horses then passing over it, and in view of the flagman's express warning not to do so. Even if it did have such right, it does not follow that it had the right to create such noise, smoke and steam as is usual and customary, for the condition that confronted appellant here was not a usual or customary condition. At any rate, it was a question for the jury to determine whether appellant was or was not negligent in running the train across this crossing at that time under the circumstances.

Complaint is also made that the court modified the third instruction, asked by the appellant, and gave it as so modified. We concur with what is said upon this subject by the Appellate Court in their opinion, when they say: "The instruction as modified and given by the court, we think was more favorable to the appellant than it was entitled to, and the modified instruction does not, as is contended by appellant, leave the jury to put their own construction upon the ordinance, but only to say whether the evidence was sufficient to show that it was violated."

It is also contended by the appellant, that an instruction given by the court of its own motion was erroneous, upon the alleged ground that it limits appellee's care to the precise time and place of the accident. This objection is not well taken for the reasons set forth in the following cases: *Chicago and Alton Railroad Co.* v. *Fisher*, 141 Ill. 614; *Lake Shore and Michigan Southern Railway Co.* v. *Ouska*, 151 id. 232; *Lake Shore and Michigan Southern Railway Co.* v. *Johnsen*, 135 id. 641.

Appellant complains of the first instruction, given by the trial court for the appellee, upon the ground that it

permits a recovery under either one of the three counts in the declaration. We see no reason why each count of the declaration does not state a cause of action, and hence the instruction was unobjectionable on this ground. The count, setting up the ordinance of the city herein-before referred to, is objected to for the reasons urged against the validity of the ordinance, as above stated. But as we hold the ordinance valid, we do not regard the count as defective for this reason. The evidence tended to sustain each count, and appellant failed to demur to the declaration, but filed the general issue. "By thus pleading it waived any objection to the declaration, un-less the declaration is so defective that it will not sus-tain the judgment." (*Himrod Coal Co.* v. *Clark*, 197 Ill. 514). The declaration here cannot be said to be so defective as not to sustain the judgment.

*Third*—The trial court is said to have erred in refus-ing to grant a new trial. This contention is based upon certain matters, set forth in an affidavit, filed in favor of the motion for new trial. This affidavit has reference to the alleged failure of the appellee to procure the pres-ence, as a witness at the trial, of a certain physician who treated plaintiff for his injuries. The Appellate Court properly dispose of this objection in the following words: "It appears that plaintiff's counsel made all reasonable effort to procure the presence of the doctor in court be-fore he closed his case, and while, no doubt, his evidence would have had an important bearing upon the extent of plaintiff's injuries, we see no reason why any inference unfavorable to the plaintiff's case should be drawn from the fact that the doctor was not called to testify in his behalf."

After a careful examination of the record, we find no error which would justify us in reversing the judgment of the Appellate Court. Accordingly, that judgment is affirmed.                                    *Judgment affirmed.*